This case arises from a fraudulent tax shelter. Appellant Matthew Concannon was sold by a treacherous financial and tax advisor, Jose Lindner. Concannon first became entangled with Lindner when Concannon joined the faculty at the University of Missouri Law School. Concannon's faculty mentor recommended that Concannon retain Lindner as his financial advisor and tax advisor. What does the appellant's relationship with Lindner have to do with the obligation on the guarantee? It matters to the issue as to whether Lindner was a fiduciary to Concannon, which was a key part of the district's court's decision on the fraud and factum defense. And it also matters to the court's decision that the delivery of the guarantee, which was – Jose Lindner delivered the guarantee to the bank. The testimony was that Matthew Concannon didn't deliver the guarantee to the bank, wasn't even aware of the name of the bank, the bank's existence. He had no knowledge whatsoever of the bank until years later when someone from the bank first contacted him about trying to collect on this guarantee. That was undisputed. And the bank didn't follow its own procedures in sending someone from the bank to obtain the guarantee. So this trusted fiduciary delivers the guarantee to the bank. And so the way that issue worked out in the case legally was the question arose, if he was the authorized agent of Concannon when he delivered the guarantee, then it was an act of Concannon that the guarantee was delivered. But if he was not authorized to act on behalf of Concannon when he delivered the guarantee, then there was no valid delivery of the guarantee. And so for those reasons, because there's an agency question involving course of conduct, according to the district court's decision, and because there's a fiduciary relationship question, I would like to briefly address the relationship between the parties and its history. Before you do that, when the district court made its finding that Linder had actual authority, was that a finding of fact or a finding of law? I believe that the question of agency is a matter of law, either he was or wasn't the agent. There could have been factual findings in support of that, but the actual decision as to whether an agency relationship exists, it either exists as a matter of law or it does not. Are the facts disputed here? The facts seem to be pretty clear that your client was in some ways too trusting, I suppose, would be one way to put it. There were disputes of fact at trial which are no longer being pressed on appeal. There were disputes about documents and things, but the actual facts of the relationship between Concannon and Linder were not disputed in any way. I'll move forward to the argument on the fraud and the factum point, which is point three, which deals with the trust issue and the right to rely on a fiduciary. The question presented on point three is, did the district court err when it rejected Concannon's fraud in the factum defense? And it was rejected based on two findings by the court. First, the conclusion that Jose Linder was not Concannon's fiduciary in relation to Providence Farms. And secondly, a finding that Linder did not misrepresent the disputed guarantee. The core dispute here is whether a sophisticated person, such as a physician, has a right to rely on a trusted fiduciary when signing documents. Is there a right to rely on a fiduciary to explain, for instance, that a document creates new financial obligations, the nature and extent of those obligations, or that it makes no economic sense to enter into those obligations because they're not required under the circumstances? That's the core issue that we're— Well, a fraud in the factum theory is—it's atypical to succeed on those when you have— when you don't have someone being defrauded as to what it was they were signing. And you have someone who could actually—they haven't been hidden from the facts. It's not the situation of putting a deed in front of a blind person and telling them it's something else. Yes, I follow you. And that was really the court's point. And this is why the fiduciary issue is so important. There's really two lines of cases here. There's cases dealing with fiduciaries and cases not. I would describe them with—I don't mean to be disrespectful—it's kind of jack-in-the-beanstalk type of cases where someone comes in contact with someone who they have no prior relationship with. They're strangers. They're at arm's length. And there's a suggestion, I'll trade you these beans for your cow. Now, under those circumstances, you have no right to rely on the representations that person makes to trust them to sign a document that they present to you without reading it or merely based on their representation, unless there's some extenuating circumstance such as blindness, et cetera. And the court decided the case under that line of cases, essentially treating this as a jack-in-the-beanstalk type of situation, and said, Dr. Kincannon, you're far too sophisticated to make any complaint here. There's a separate line of cases dealing with fiduciaries. The Rao case, for instance, we cite in our brief. And this is why it is so critical— Well, let's just assume, without deciding it, that he is a fiduciary. Yes, Your Honor. You still have to prove— Lack of negligence. Yes. Yes, Your Honor. And the case law that we're relying on says that you have an absolute right to rely on your trusted fiduciary to— Not to the exclusion of our people. Concern for your own— I think what Judge Lowery, I believe, ultimately held in this case, or her rationale was, she looked at the copy of the guarantee, and I'm presuming here she thought to herself, if someone had presented me with this guarantee and I had looked at it, I would have understood that I was incurring an obligation. That's not in the judgment, but I think that's fair to infer. The contents were available to— Yes. The case law, however— Let me just jump to the policy consideration here, Your Honor. The policy consideration is this bigger issue of reliance of a sophisticated person on a fiduciary. Sophisticated business people involved in complex matters must frequently repose trust and confidence in fiduciaries, including accountants, tax preparers, business advisors, as Kincannon did in this case. It's a critical point because if this court affirms the district court's reasoning, it will undermine the fiduciary relationships of all sophisticated persons. You're essentially going to create a negligence analysis when you want to rely on a fiduciary. Instead of being able to say, this is my fiduciary, I have a trusted relationship, the nature of the relationship here is that I can repose trust and confidence in this person and in what they tell me and in what they advise me. If we're going to put a negligence analysis on reliance on fiduciaries, then every decision to rely on a fiduciary will be subject to later challenge on the basis of— But we don't get to negligence if we don't have a misrepresentation of the document, right? Yes, that's the key point here. Judge Lowry said there was no misrepresentation of the document, essentially affirmatively. The evidence was that at various times, either Mr. Lindner or his assistant, Julie, would bring documents to Dr. Kincannon, and this is not disputed testimony, say these are documents that need to be, and exactly what was said is in the record, but these are documents that need to be signed in relation to the tax credit, and they were represented as routine documents. There was no disclosure of the fact that these are new documents. You have never signed any document like this before. This creates a new obligation. It's a blanket guarantee of all existing debt and all future debt, and the value of that debt is approaching $20 million. There was none of that disclosure whatsoever. Dr. Kincannon testified that the only disclosure he ever had from Lindner was that the original $600,000 that he invested in a tax shelter, he would receive a $600,000 tax credit, essentially dollar for dollar, and would have no further exposure. It sounds like you're describing a great case against Lindner, but as to the third parties who relied on the guarantee, it seems problematic. Fraud in the fact is a recognized defense. When the FDIC takes over a loan and forecloses under the O'Dentch Doctrine, almost all possible defenses against the original bank or source of funds are essentially laundered out. They no longer exist. But under the O'Dentch Decision, there are several defenses that survive which can be asserted against a later holder, and that includes specifically the fraud and the factum defense. If there was fraud in the factum, there is no obligation that Radiance can now enforce. The question is, how is that fair to Radiance? The bank in this case, and it's discussed in our brief some cases about this, when an agent appears at the bank and represents themself to be an agent, bringing you, for instance, a guarantee of $20 million, you are on notice as a bank that you must inquire and determine whether that agent actually has the authority that they purport to have or that they appear to have. And so when the bank doesn't send someone out to get the signature per their regulation, and when Lindner arrives representing that he has authority to deliver the guarantee and bind Kincannon to $20 million, the bank is on notice under the case law that it must inquire, pick up the phone, call Kincannon. Kincannon did not hear from the bank until years later when it first sought to enforce the guarantee. I think that addresses the equity issue of what is the bank's role in this negligence analysis. The second point that I'd like to make sure I address is the FDIC issue concerning whether there was a valid chain of assignments. The question presented here is, did the district court make a mistake of law when it rejected Kincannon's argument that the chain of title was defective due to a void transfer? The core dispute here is whether the FDIC's structured transaction was ultra-virus, which would spoil the chain of assignments in this case. And I don't think there's any dispute among the parties that that is correct analysis. The question is, was it an ultra-virus structured transaction? The relevant facts, again, there were no dispute about these facts. The district court in its order found these facts and then ruled that there was authority. What case do you have to that effect, or what statutory law do you cite? What we cite is the general and well-known case law that a federal administrative agency is a creature of statute. It has no power unless or until Congress authorizes it to act. As the Supreme Court said in the Federal Trade Commission v. Rallodom case, we cite official powers cannot be extended beyond the terms and necessary implications of the grant. If broader powers be desirable, they must be conferred by Congress. These kinds of transactions have been happening for decades. No, Your Honor, that's the difference in this case. I think it is good public policy. It's good for the taxpayers. But the FDIC did something completely different in this case. Under its authority as a receiver, there's specific statutory authority for what they can do as a receiver. We've cited it in our briefs.  They can create certain specific types of entities. And we argue that saying you can create these two types of entities excludes you from creating other types of entities that aren't mentioned. What the FDIC did in this instance was something novel. Instead of auctioning these notes and loan files on the open market to private parties, as they usually do when acting as a receiver, what a receiver normally would be understood to do, for very good public policy reasons, they developed this new structured transaction program. It was based on things that happened back in the savings and loan crisis and the FLSIC. And there was a huge windfall to private investors because of the way those properties got dumped on the market. And the FDIC, again, without any, although it's very desirable, Congress never authorized them to do this. They decided to form public-private partnerships with private equity. And so the FDIC created an LLC, a private business entity, 50-50 owned by the FDIC and this private equity firm, Acorn Private Capital Management, and then after forming this limited liability company, which they have no authority to form a limited liability company, let alone to form one in a partnership with private equity interests, they then sell the note to that entity that the FDIC, supposedly acting in its role as a receiver, now owns 50-50 with private equity. To own a loan file as an LLC with 50-50 membership with a private capital company is not acting as a receiver at that point. Perhaps the transfer to that entity was done as a receiver, but now standing on the other end of that transaction, taking ownership of that in a 50-50 partnership with a private entity, that is nothing that has been done for decades, Your Honor. That is nothing that Congress ever contemplated. It is not mentioned in the enabling statute in any way, shape, or form. And we argue that extensively in the brief. It was good public policy, allowing Acorn Capital Management to manage these properties for a period of time, manage the correct moment at which to put them onto the market, to not dump them all on the market at the same time, good public policy, and in the end, half of the windfall went back to the taxpayers. Very desirable, not authorized by Congress. Thank you, Mr. Brown. Mr. Jones? Since it's fresh before us, would you address the last issue first in relation to the authority of the agency? Yes, Your Honor. Mr. Chief Judge, may it please the Court, As the Court is aware, Kincannon's argument is that the FDIC committed an ultra-virus act by entering into a structured transaction with private investors using LLCs that were co-owned by the FDIC and other private investors. Essentially, the argument is that the FDIC acted outside of its authority when it sold certain assets of Premier Bank, such as the guarantee at issue, and then further acted outside of its authority when it partnered with the CADC. In Kincannon's brief, he cites the case of the Louisiana Public Service Commission in support of his argument that the FDIC was acting outside of the scope of its authority. That's the only case he cited in his brief, and that case is highly distinguishable from our situation at hand. In the Louisiana Public Service Commission case, it dealt with a federal agency's preemption of state law. That case did not deal with a situation where, as in our case, a federal agency acted in conjunction with a private entity in furtherance of carrying out its express powers. Your Honors, the statutes clearly provide the FDIC to expressly act as a receiver for failed banks. That's 12 U.S.C. 1819. Kincannon admitted in his opening brief that the role of a receiver is to take charge of the assets and can serve them for liquidation or reorganization. That's what the FDIC did in this particular situation. Kincannon argues that the FDIC would have been better served to have employed other methods in conserving the assets and liquidating the assets of Premier Bank, but the statute does not say that these are the only ways you can do it. A bridge depository institution, things like that, these aren't the only ways. It doesn't exclude the way— Well, the challenge is that there's not statutory authority for what was done here, the creation of an LLC and co-partnership with it. What statute do you cite for authority being present? The statute that we cite that's in our brief is that it's the statute giving the FDIC power to employ all incidental measures in furtherance of— Is that part of 1821B? That's correct, yes. Any particular specific section of that statute? Your Honor, there's no particular section of that statute which explicitly authorizes the FDIC to have done what it did, but there's also no explicit provision prohibiting the FDIC from doing what it did, nor is there any case law saying that— But wouldn't authority have to be there? I don't think you can just say, well, since it didn't say you can't do it, it means they can't. Delegation of authority doesn't work that way with governmental authority. Well, I understand the argument to that effect, and that's the argument Kincannon has made, but again, our response to that is that the FDIC was acting— what they did here was incidental to their express powers expressly conferred upon them by Congress and conserving and liquidating the assets of Premier Bank. This was something done in furtherance of that. We don't believe that the, quote, historically employed methods were the only way in which the FDIC was authorized to act. And again, Kincannon has cited no cases, no statutory authority, indicating that what the FDIC did was wrong. If this Court determines what the FDIC did to be wrong, it would be the first Court that has ever made that determination, to my knowledge. Well, a cynic might say that this is a case of the old saying that necessity knows no law. It's more important to protect the taxpayers than there is to hew to any specific requirement of law. And as Mr. Kincannon's counsel informed the Court, what the FDIC here did provided a benefit to the taxpayers. Well, they certainly did that during the savings and loan thing to try to make up for what Congress had failed to do, and there's no use elaborating on that. It's history. Counsel, it's my understanding there is analogous litigation that has gone on in other circuits involving the Federal Housing Finance Agency. Are you familiar with that line of cases? I would have to say that I'm not, Your Honor. I didn't see those when I was preparing our brief. I don't believe they were cited by Mr. Kincannon in his brief either. Moving on with respect to that again, Your Honors, our argument is that what the FDIC did here was not prohibited, has not been determined to be unlawful by any court. It was expressly incidental to the express powers conferred upon the FDIC, and we believe that it was a lawful way in which to conserve of and liquidate the assets of Premier Bank. Also, it should be noted that the FDIC is granted broad authority in determining what to do when it comes to conserving and liquidating the assets of a failed institution. So I believe that broad authority conferred upon it would certainly encompass the actions that the FDIC employed in this particular matter. If there are no further questions with respect to the structured transaction, I'll move ahead to the delivery of the guarantee to Premier Bank. The district court found as a finding of fact that Lindner delivered the guarantee to Premier Bank on behalf of Kincannon. Accordingly, this finding, because it is a finding of fact, is subject to clearly erroneous review, which is, as the court knows, the highest standard there is in appellate review. So you're saying that the finding of fact included not only the delivery, but the actual authority to make the delivery? What I'm getting at right now is simply the delivery of the note to Premier Bank. That was a finding of fact subject to the clearly erroneous standard of review. The district court made a number of findings with respect to this relationship between Kincannon and Lindner. Among those findings was that Kincannon relied on Lindner to prepare forms related to Providence Farms for his signature. Kincannon believed Lindner was acting on his behalf and paid Lindner to act on his behalf. Kincannon admitted through his own testimony that the guarantee must have been provided to him by Lindner. As a result of these factors, the district court found, as a matter of law, that Lindner had actual authority to deliver the guarantee to Premier Bank. So what I'm getting at is if the court does not overturn those findings of fact, and to do so the court would have to say those findings of fact were clearly erroneous, if those findings of fact are upheld, then the district court's finding, as a matter of law, that Lindner had actual authority must be upheld as well. So given the facts of this case and the findings of the district court, it's clear that Lindner was acting as Kincannon's agent when he brought him the guarantee to sign. Kincannon believes the district court should have set forth exact points in time that Lindner was and was not acting as Kincannon's agent. But as this court surely knows, the long-standing rule of appellate procedure is that he who has the favorable verdict receives the benefit of every favorable inference. The clear inference in this case, and one Kincannon even expressly admitted to, is that Lindner was acting as Kincannon's agent when bringing him documents to sign. One of those documents was the guarantee. Delivery of the guarantee to Premier was incidental and inevitable. If it were not delivered, it would be of no value. It would be worth no more than the paper it was written on. It was necessary to make the guarantee binding against Kincannon, and as the district court noted, if Kincannon did not intend for Lindner to deliver the guarantee to Premier Bank, Kincannon should have expressed that and told Lindner not to. Counsel, could you address Mr. Brown's argument that the bank had a duty of inquiry once this guarantee arrived not from the person signing it but from an agent? Yes, Your Honor. I don't believe that's accurate, and I believe it mistakes the law. I'm not aware of any case where a bank has been provided a guarantee and they have been thereafter given an affirmative duty to contact the individual. Wouldn't it just be good underwriting, though? It's not necessarily any kind of a rule. It would just be good underwriting. I would agree it's probably a best practice. You know, when you get a guarantee from somebody obligating them to repay millions of dollars, I would suggest that it's probably wise for the bank to call that individual to confirm that he or she signed that guarantee, but I'm aware of no case law or no statutory authority which obligates the bank to do that. So absent case law or statutory authority to that effect, I don't believe Premier Bank had a duty to further inquire as to the scope of Kincannon's, or I'm sorry, of Lindner's agency. Had Lindner provided other documents to the same bank over some period of time, or had there been any kind of prior relationship established that he was, in fact, the authorized representative for Dr. Kincannon? Yes, Your Honor. Certainly there was, and as the district court notes in its decision, there was a longstanding relationship between Kincannon and Lindner. With respect to the Providence Farms project alone, Lindner, his staff, would bring Kincannon documents to sign multiple, probably dozens of times. The two individuals had a longstanding relationship with each other that went back. But I'm referring to Lindner's connections with others on Kincannon's behalf. Was there record evidence that others acknowledged that? In fact, was there any prior connection between Lindner and the entity to which the guarantee was given? Not to my knowledge, Your Honor. Again, what was the benefit to Dr. Kincannon in this relationship with Lindner and this Providence? Yes. What did he get out of it? Your Honor, he became a part owner in this Providence Farms LLC. Providence Farms was a real estate development company. Lindner invested money into it and was a partner, and as a result, Probably irrelevant, but in terms of financial benefit, what did he get out of this? Out of signing the guarantee? Yeah. I'm not sure. I agree with you. I'm not sure that it's relevant to the issues here, but. Well, it's more than passing. Well, I shouldn't say more than passing. Strange, but he's on the hook for what? How many millions now? About $20 million right now. And I guess that's. . . I don't believe that that particular issue came out during the trial in the district court. It's one of those things that's interesting, but perhaps irrelevant from a legal standpoint. I don't know. Well, my presumption would be that he was afforded a partnership interest, Probably in excess of what he paid for it in exchange for him signing this personal guarantee. I don't believe that came out of the district court. I see. Okay, well. I would imagine that was probably the carrot for the stick. If there are no further questions on that particular delivery issue, then I'll address the fraud and the factum, if that's all right with the court. Proceed. Regarding the fraud and the factum, Duncan Cannon's negligence to read the documents simply cannot rise to the level of fraud and the factum. This court has been very explicit over the years in establishing a very high bar for the fraud and the factum defense to prevail. The fraud and the factum is found on very rare occasions. The cases that I have seen entail situations where you had one party providing documents to the other party to sign who was in a vastly superior position. For example, there was one case where it was a 90-year-old woman's son or daughter providing a document to sign, and they represented the document to be a receipt where, in fact, it actually obligated the 90-year-old woman to repay back a bunch of money. Other issues were, as the court- Counsel, let me ask this. If, in fact, Mr. Lindner was a fiduciary of Mr. Concannon, wouldn't that affect the negligence analysis that the court should have undertaken? I would disagree with that, Your Honor, and we cited a case specifically on point with respect to that topic. An analogous case is the relationship between an insurance agent and the insured. The insurance agent is an agent of the individual buying insurance from that particular person, but the insurance agent is not a fiduciary, and there was a case specifically on point that we discussed in our brief, the Farmer's Insurance Company v. McCarthy case. So I would strongly disagree with the assertion that just because one is an agent, one is also a fiduciary. Further, even if one is a fiduciary, that does not excuse the signer's negligence in failing to read the document he or she was provided. In this particular case, we don't have an uneducated, blind, senile type of person who was signing this document. It was Dr. Concannon, who's a practicing physician trained at Harvard Medical School. There's no evidence that he could not have been aware of the nature and the contents of the document he was signing. Cases are very clear, both state and federal, that one is presumed to have read the entirety of any document he signs. So I don't believe there was any negligence on his – that there should have been a finding of negligence on his part. Counsel, I believe your time's expired. Thank you, Your Honor. Thank you, Mr. Jones. Mr. Brown, I believe you used up just about all your time, but if you heard something that you have a desire to respond to in a minute, we'll – I would just direct you to page 35 of our opening brief. There's an entire section on Premier Bank's duty of inquiry with case law citations. Thank you, Your Honor. Thank you, Mr. Brown. The court thanks you also, Mr. Jones, for your presence this morning and the argument that the two of you provided to the court. We'll take the case under advisement.